[No. 15313. *En Banc.* May 24, 1919.]

THE STATE OF WASHINGTON, *on the Relation of Frank P. Mullen, Plaintiff*, v. I. M. HOWELL, *Secretary of State, Respondent.*[1]

STATUTES (74)—CONSTRUCTION—EXCEPTIONS. The seventh amendment, art. 2, § 1, of the constitution, which reserves to the people a right to a referendum of all laws except such as are necessary for the immediate preservation of the public peace, health, or safety or support of public institutions, is an expression of a reservation to pass upon all things not specified in the exception.

CONSTITUTIONAL LAW (24) — STATUTES (54) — CONSTRUCTION. A law will not be held unconstitutional unless such holding is compelled.

CONSTITUTIONAL LAW (3) — CONSTRUCTION. Constitutional provisions must be interpreted with reference to the times and circumstances under which the constitution was framed.

STATUTES (2-3)—INITIATIVE AND REFERENDUM—WHAT LAWS SUBJECT TO—"ACT, BILL OR LAW"—APPROVING AMENDMENT TO FEDERAL CONSTITUTION. The joint resolution of the legislature ratifying the prohibition amendment to the Federal constitution is subject to referendum, being an "act, bill or law" within the meaning of the seventh amendment of the constitution, art. 2, § 1, adopting the referendum form of government.

SAME (2-3). The authority for state action on a proposed amendment to the Federal constitution is found in the Federal and not the state constitution, and the power to question it being in Congress and not in the courts, the contention that the legislature had no power to act by resolution is nonjusticiable.

SAME (2-3). Article 5 of the Federal constitution, providing that a proposed amendment shall be valid when ratified by the legislatures of three-fourths of the states, means that the ratification shall be by the legislative power of the state, which, under the reserved power of referendum, includes the whole people as part of the law making power, and renders legislative action on a proposed amendment subject to a referendum.

SAME (2-3). The adoption of the referendum form of government does not violate the Federal constitution, art. 4, § 4, guaranteeing to every state a republican form of government.

PARKER, MITCHELL, TOLMAN, and FULLERTON, JJ., dissent.

[1]Reported in 181 Pac. 920.

Application filed in the supreme court April 9, 1919, for a writ of mandamus to compel the secretary of state to accept and file a petition for a referendum. Granted.

*Theodore A. Bell, John F. Murphy, Turner, Nuzum & Nuzum,* and *P. C. Sullivan,* for relator.

*L. L. Thompson, Attorney General,* and *Glenn J. Fairbrook, Assistant,* for respondent.

CHADWICK, C. J.—At the general election held in 1912, the people of the state of Washington adopted as a principle of government the power to initiate laws and to review at the bar of popular opinion all acts, bills, or laws passed by the legislature of the state of Washington.

The right so to do is emphasized as a power reserved, and the terms of the amendment imply in the strongest possible way that the intention of the people was to reserve a right to review every act of the legislature which might affect the people in their civil rights or limit or extend their political liberties; for they wrote an exception, saying that a referendum may be ordered in all cases, "except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions." (Amendment 7, art. II, § 1.) The writing of an exception specifying the things not reserved is an expression, within sound rules of construction, of a reservation to pass upon all things not so specified.

The court, in passing directly upon the amendment, and in other cases arising under city charters, has held firm to the principle of the referendum and has consistently refused to limit it by construction.

In December, 1917, Congress proposed an amendment (Stats. of U. S., Sixty-Fifth Congress, 1918, Sess. II, Ch. 212, p. 1050) to the Federal constitution, providing that:

"Section 1. After one year from the ratification of this article the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all territory subject to the jurisdiction thereof for beverage purposes is hereby prohibited.

"Sec. 2. The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation.

"Sec. 3. This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the legislatures of the several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress."

It will be noted that the amendment does not pertain to matters within the original concept of the constitution, to the definition or distribution of powers of public officers, but by its terms assumes to cover matters that are purely legislative and which have hitherto been a subject of legislation by the several states under the police power. We understand that the Federal government has no power to control the police power of the states except as such power may have been expressly granted, or as it may be necessary to maintain the acknowledged powers of the Federal government.

This amendment was submitted to, and ratified by, the legislature of the state of Washington by joint resolution passed January 13, 1919. On March 20, 1919, relator tendered a petition for a referendum to the respondent secretary of state; he asked that it be filed and a ballot title be supplied. Respondent re-

fused to receive it upon the grounds, (a) that the amendment, having been adopted by a joint resolution and not by an act, bill or law, was not within the terms of the seventh amendment; and (b) that it was not a subject for referendum under article V of the constitution of the United States.

Addressing ourselves to the first contention of the respondent, Is the resolution an act, bill or law, within the meaning of those terms as employed in our constitution; whether the people intended an act, bill, or law to be statutes enacted by the legislature, or whether they meant action by the legislature which affected them as law?

No cases have been cited, and we may confidently say that there are none holding to the rule of strict construction where the power of the whole people is in question. It is a rule, become axiomatic by long continued reiteration, that no court will hold a law to be unconstitutional unless such holding is compelled; that a law will not be held to be unconstitutional by construction; that is to say, the power of the legislative body, or the people if exercising that function, will not be abridged by the courts, or suffered to be abridged by others, if the thing sought to be done is within the spirit of the policy enunciated in the provision under consideration. To this end, the courts of the country have so addressed themselves that, without resort to the tedium of limitless authority, we may well adopt the language of Judge Cooley, who was an acknowledged master in the field of constitutional law; that constitutional provisions must be interpreted with reference to

"The times and circumstances under which the State Constitution was formed — the general spirit of the times and the prevailing sentiments among the people. Every constitution has a history of its own which is

likely to be more or less peculiar; and unless interpreted in the light of this history, is liable to be made to express purposes which were never within the minds of the people in agreeing to it." *People v. Harding,* 53 Mich. 481, 19 N. W. 155, 51 Am. Rep. 95.

"The safe way is to read its [the constitution's] language in connection with the known condition of affairs out of which the occasion for its adoption may have arisen, and then to construe it, if there be therein any doubtful expressions, in a way so far as is reasonably possible, to forward the known purpose or object for which the amendment was adopted." *Maxwell v. Dow,* 176 U. S. 581, 602.

"The courts are not bound by mere forms, nor are they to be misled by mere pretences. They are at liberty—indeed, are under a solemn duty to look to the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority." *Mugler v. Kansas,* 123 U. S. 623, 661.

The people, too, have directly charged us with a duty to be mindful of their sovereign rights.

"A frequent recurrence to fundamental principles is essential to the security of individual rights, and the perpetuity of free government." Const., art. 1, § 32.

Wherefore, the purpose of the people in adopting the seventh amendment is a proper subject to be considered. Did they intend to grant any exceptions other than those enumerated in the seventh amendment? If this were an ordinary case of statutory construction, we have no doubt that we could all agree that we would look first to the old law, the mischief, and the remedy. It is more important in considering a question involving the first of all the sovereign rights of the citizen—the right to speak ultimately and finally in matters of political concern—that we should measure the power reserved by the former condition.

It is well known that the power of the referendum was asserted, not because the people had a willful or perverse desire to exercise the legislative function directly, but because they had become impressed with a profound conviction that the legislature had ceased to be responsive to the popular will. They endeavored to, and did—unless we attach ourselves to words and words alone, reject the idea upon which the referendum is founded, and blind ourselves to the great political movement that culminated in the seventh amendment—make reservation of the power to refer every act of the legislature with only certain enumerated exceptions.

Guided by these considerations, we are satisfied that the people used the words "act, bill or law" in no restricted sense, but in a sense commensurate with the political evil they sought to cure.

And why should not the amendment be a law within the meaning of the seventh amendment? No reason is assigned other than that "law" as there used is synonymous with "bill" or "act." We may well argue and be within sound rules that, if the people had so intended, they would not have used the word "law" at all, as was done in the state of Oregon. We can conceive of no more sweeping law than the proposed amendment. Certainly no amendment has ever been proposed that goes deeper into the vitals of the American idea of government. It surrenders *pro tanto* the sovereignty of the state, gives to the Federal government a right to enact laws and to enforce them through the Federal courts, and it will deny the citizen the protection of some of those guarantees that we have written out of the travail of time into our own Bill of Rights. Upon construction, we hold that the amendment to the constitution of the United States is a law

within the meaning of the seventh amendment, and is subject to referendum.

But it is contended that, whereas the legislature ratified the amendment by joint resolution instead of by act or bill as it might have done, the resolution being not *eo nomine* an act, bill or law, is not subject to a referendum. This argument defeats itself, for if we are to be literal and exact in terminology and so insistent upon "scholastic interpretation" as to admit this premise, we must hold that the legislature had no power to ratify the amendment except by act or bill, for we find no power granted in the constitution to that body to act in matters legislative other than by act or bill.

This reasoning would lead to two consequences, equally absurd: Either the amendment being ratified by resolution, the act of ratification is void as a thing done in a manner not provided; or, if sustained, would permit the legislature to defeat the power of referendum by acting, in matters purely legislative, by resolution instead of by bill. The latter is the consequence in the instant case, if the argument of the learned *Attorney General* is to be sustained. But we are not put to the extremity of holding that the legislature may not, in matters of ratification, act by resolution, for there is a high road of reason leading down to a true result.

The contention that a resolution, although it may have the force and consequence of a formal legislative enactment and affect the people in their civil and political rights, cannot be referred arises from a misconception of the term. This case sounds in fundamentals, not in definitions. It is not the resolution, but the *act* of the legislature in adopting it that is to be referred. A resolution, like all acts of the legislature, is to be measured by the end accomplished. It is true

that we have no provision in our constitution providing for the passage of resolutions, even in the formal matters in which the legislature has throughout the entire history of our territory and state been wont to act, but it is just as evident that there is no limitation upon the power of the legislature to act by resolution.

· The constitutions of some of the states and the constitution of the United States (section 7, article 1) permit or recognize the practice of acting by resolution, and some of them limit its uses. It has been held, if the constitution is silent, as ours is, that legislation cannot be effected by that method. *Boyers v. Crane,* 1 W. Va. 176; *State ex rel. Attorney General v. Kinney,* 56 Ohio St. 721, 47 N. E. 569; *Barry v. Viall,* 12 R. I. 18.

: And were we considering a matter involving private right arising in or out of the laws of this state, we could not question the authorities just cited; but they are not applicable for the reason that the authority to act in the matter of a proposed amendment to the constitution of the United States does not arise in or out of the constitution of the state, but arises out of the Federal constitution, and any act, whether it be by resolution or by bill, on the part of the state legislature must be held to be a sufficient expression of the legislative will unless Congress itself challenges the method or manner of its adoption. It is upon this principle that the supreme court of the United States has held that the question whether the referendum does violence to the constitution of the United States is non-justiciable, holding that the question whether it deprives the government of a state of its representative character, thus violating the guarantee of a republican form of government, is a question for Congress and not for the courts. The power to question the manner of adoption being in Congress and not in

the courts, the contention that the legislature had no power to act by resolution is non-justiciable; but this holding does not foreclose an inquiry as to the legislative character of the thing done.

It may be that my argument is not entirely clear. If so, we may profitably resort to an illustration. The people of the state of Washington have, by expression of their reserved right to legislate upon all proper subjects of legislation, declared the policy of this state to be against the barter and sale of intoxicating liquor within the state and, by subsequent laws, that we as citizens of a sovereign state are opposed to the use of intoxicating liquor by any of our citizens. The original law by its accretions has become what is popularly called, in the nomenclature of the Anti-Saloon League, "bone dry." This the people did of their own free will and accord and by the assertion of an hitherto unused power. Let the question occur, Can their act be undone by any plan, power, or authority less or other than the power that established the present state of the law? Keeping in mind our present "bone dry" condition, or plight, if that term be preferred, suppose the Congress of the United States should propose an amendment to the Federal constitution providing that it shall hereafter be *lawful* to ship into and sell in all of the states of the Union wines and beers containing not to exceed a certain minimum of alcohol—that it has the power so to do will not be denied. Then suppose that the state legislature did, by resolution, as in the present instance, ratify the amendment, and that it was ratified by a sufficient number of states only, including our own, to meet the demands of the Federal constitution. We would then have a law that was not a law before, that would wipe out *pro tanto* the present law; that would work such an exception to it that so far as the policy of our citizens had been expressed by

their direct vote, would defeat its purposes. In such event—and it is a reasonable postulate—would it be urged for one moment that the people of this state could be denied a right of referendum to determine for themselves under their reserved powers whether they desired their own law to be thus overcome? Would they have to stand by helplessly while the fruits of their victory were swept away and their sovereignty surrendered in degree by resolution of the legislature?

I opine that we would find some way to declare that the right to refer the matter to the people who had theretofore exercised their reserved power upon the very subject of the proposed legislation could not be thus defeated. It is no argument to say that a referendum in that event would operate to promote a good cause, while this demand comes from those who would defeat all liquor legislation. We are here to declare the law, not to maintain or defend policies, and it is enough to say that the relator is within the law as declared by the whole people and, as such, his right should not in conscience be denied. We cannot fit a rule to meet a particular case; it must apply to all alike, whatever the cause and whatever the character of those who invoke it.

The final and, as we believe, the principal ground of opposition is that the amendment, being submitted under article V of the constitution of the United States, is a Federal question in the sense that state laws and state constitutions have no bearing upon or relation to the issue.

It is argued that, inasmuch as article V of the constitution of the United States provides that a proposed amendment ''shall be valid to all intents and purposes, as part of this constitution, when ratified by the *Legislatures* of three-fourths of the several states, or by

conventions in three-fourths thereof,'' etc., the people have hitherto fixed the manner and form of ratification, against which the reserved power of the people of a sovereign state may not prevail. If we are to stand upon the word ''legislatures,'' if that word, and that alone, is the Alpha and Omega of our inquiry, it follows that the controversy is at an end, but we are cited to no instances where a great question involving the political rights of a people have been met by such technical recourse—where any court has so exalted the letter or so debased the spirit of the law.

In *Noble State Bank v. Haskell,* 219 U. S. 104, Ann. Cas. 1912 A 487, 32 L. R. A. (N. S.) 1062, Justice Holmes frowned upon a like invitation, saying:

''We must be cautious about pressing the broad words of the Fourteenth Amendment to a drily logical extreme. Many laws which it would be vain to ask the court to overthrow could be shown, easily enough, to transgress a scholastic interpretation of one or another of the great guarantees in the Bill of Rights. . . . judges should be slow to read into the latter [the Constitution of the United States] a *nolumus mutare* as against the law-making power.''

It may be set down as a truism that the Congress of the United States has no concern of the manner in which the people of the several states pass upon the proposed amendment. It is the act of ratification or rejection by the legislative power in a state, and not the manner of doing, that makes for the result to be accomplished.

It may be true that it might have been provided that amendments could be made directly by Congress, and the submission of amendments for ratification or rejection by the legislatures of the several states at all was a matter of grace upon the part of the whole people when the constitution was adopted, but we would

incline to the opinion that the right to pass upon proposed amendments should be treated as a reservation in the several states of the right to express their legislative will in the manner in which they had then provided or might thereafter provide, and, when so regarded, as a compact between the states and the Federal government.

It is provided in the Federal constitution that proposed amendments shall be ratified by the legislatures of the states or by conventions assembled for the purpose of considering them. It cannot be urged successfully that the framers of the constitution used the words "legislatures" and "conventions" as terms describing then present institutions, for it is well known that, at the time the constitution was adopted, some of the states did not have legislative assemblies.

Article V can mean no more than this: that no amendment shall be adopted unless it is sanctioned by the supreme legislative power of a sufficient number of the commonwealths, whether such ratification be by legislative assembly, convention, or such other method as might thereafter be adopted by the people in the several states.

If we hold that the words "legislatures" and "conventions" do not control the plain purpose and spirit of article V—that is, that the people shall pass upon a proposed amendment by their representatives, if that be the plan provided by them at the time of its submission, or, if not, under such other plan of expressing their will as may not be offensive to the Federal constitution—we are on solid ground. For the framers of the constitution had well in mind—for they had lived in that time when our political system was being fashioned into concrete form—they understood, as we sometimes forget—that

"The theory of our political system is that the ulti-mate sovereignty is in the people, from whom springs all legitimate authority." Cooley, Constitutional Lim-itations (6th ed.), p. 39.

Wherefore it may be said that it is the meaning and intent of article V that an amendment to the constitu-tion of the United States shall not become effective until it has been ratified by the legislative authority of a sufficient number of the states, and it should not be held that a ratification or rejection by a popular vote under the referendum clause of a state constitu-tion would be contrary to the provisions of article V, unless it can be said, under sound rules of construction, that the referendum is offensive to the constitution of the United States.

The people of several of the states, having the sov-ereign right of self-government, excepting only as they may have yielded that right under the constitution of the United States and its amendments, have adopted the referendum as a rule of government, and the only objection that has ever been urged, or that could have been urged against it, is that it violates section 4, ar-ticle IV, of the constitution guaranteeing to every state a republican form of government. The supreme court of the United States has held that it does not so offend. *Pacific States Telephone & Telegraph Co. v. Oregon,* 223 U. S. 118.

The fault of disassociating a word or correlative words from the text of a written law and premising a judgment without the warmth of the spirit of that law may be illustrated. If we are wrong it may well be that a state might, and withal unwittingly, put it be-yond its power to pass upon a proposed amendment to the Federal constitution. If the people of this state had, when they adopted the referendum, provided for the abolition of our legislative assembly (as they might

have done), and had provided that all laws should thereafter be initiated by and voted upon by direct vote of the people, or that the legislative functions of the state should be exercised by a council of three and that all their acts should be subject to a referendum at the next succeeding general election, it would follow, under the theory advanced to defeat a referendum in this case, that a proposed amendment could not be either ratified or rejected in the state of Washington, for there would be no "legislature" or "convention" in the sense in which those terms are employed in the Federal constitution.

Significance is placed on the word "conventions," it being contended that, if the word "legislatures" had been used alone, our argument might seem plausible, but the added word "conventions" necessarily implies that Congress had in mind a representative body and not legislative authority; but we are inclined to take a broader view.

It was doubtless intended that "legislatures" should mean one thing; that is, the legislative authority of the state; and "conventions" another thing, an extraordinary representative body convened by and in the state for the sole purpose of passing upon the proposed amendment to the Federal constitution. If it had no other intention in adopting the term "legislatures"—in specifying one of the instrumentalities for passing upon the proposed amendment—than to express the idea of legislative power, of whatever that power consists, then it must be deemed to mean all the branches or component parts of that power, which have included the qualified voters also if they so desire. Inasmuch as the constitution was formulated not for a day or a year, but for all time, except as amended, we may consider that it contemplated the same kinds

of state legislative bodies then in existence and known to the framers, or any other kinds of legislative bodies that should come into existence in the future.

One of the important ideas governing the framers of the national constitution was that amendments to that instrument should be ratified by the states as units, recognizing and preserving the integrity and sovereignty of the states as parties to the compact creating and continuing that constitution. Doubtless there was no other idea prevailing in providing for adoption of amendments by the ''legislatures'' or ''conventions'' of three-fourths of the states than that. Certainly it was, and is, of no concern to the others what sort of legislature any particular state has, so long as it conforms to the scheme of a republican form of government.

We have preferred to meet the question upon the plane of broad reason, having in mind the spirit and policy of the referendum, but we are not without competent authority to prove that the manner or the name attached to the legislative power of the state, whether it be a representative body or the people themselves, is of no concern to the Federal government.

In *State ex rel. Schrader v. Polley*, 26 S. D. 5, 127 N. W. 848, it was contended, inasmuch as it was provided in the Federal constitution (art. 1, § 4) that

''The times, places and manner of holding elections for senators and representatives, shall be prescribed in each state by the Legislature thereof . . .,''

the relator was entitled to have his name go upon the ballot at a general election under an act of the legislature but against which a referendum petition had been filed. And it would seem, if the argument of the respondent is sound, that the prayer of the relator in that case should have been granted, for there

the constitution of the United States provided that the *legislature should prescribe the times, places and manner* of holding elections, while in the instant case the provision is that the amendment shall be ratified by the legislatures.

After noting the tenth amendment to the constitution that "the powers not delegated to the United States, . . . are reserved to the states respectively or to the people," which, by the way, is a declaration that the people of the several states may function their legislative power in their own way, especially so when the ninth amendment, "the enumeration in the constitution, of certain rights, shall not be construed to deny or disparage others retained by the people," is regarded—for the right to legislate directly or by representative bodies is a right assuredly retained, and being retained may be exercised in the form and manner provided by the people of a state—the court says:

"We are also of the opinion that the word 'Legislature,' as used in section 4, art. 1, of the federal Constitution, does not mean simply the members who compose the Legislature, acting in some ministerial capacity, but refers to and means the lawmaking body or power of the state, as established by the state Constitution, and which includes the whole constitutional lawmaking machinery of the state. State governments are divided into executive, legislative, and judicial departments, and the federal Constitution refers to the 'Legislature' in the sense of its being the legislative department of the state, whether it is denominated a Legislature, General Assembly, or by some other name. Under section 1, art. 3, of the state Constitution, it will be observed, the people of this state have reserved to themselves, as a part of the lawmaking power, the right to vote by referendum, upon any law passed by the Legislature, with certain specified exceptions, prior to the going into effect of such law. That the excep-

tions mentioned are 'such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government or its existing state institutions.' It is clear that said chapter 223 is not within any of these exceptions. Under the Constitution of this state, the people, by means of the initiative and referendum, are a part and parcel of the lawmaking power of this state, and the Legislature is only empowered to act, in accordance with the will of the people as expressed by the vote, when the referendum is properly put in operation. The term 'Legislature' has a restricted meaning which only applies to the membership thereof, and it also has a general meaning which applies to that body of persons within a state clothed with authority to make the laws (Bouvier's Law Dic.; Webster's Dic.; 18 Am. & Eng. Ency. 822; 25 Cyc. 182), and which, in this state, under section 1, art. 3, Const. S. D., includes the people. . . .

"In *Baldwin v. Trowbridge*, 2 Bart. Contested El. Cas. 46, the minority report in presenting the legal side of the controversy shows the following pertinent language which meets with our approval: 'But it was argued that this power was by express terms left, not to the states simply, but to the Legislatures thereof, and that this is such a limitation upon the people of the states that they have now power to restrict their Legislatures in the exercise of this right, conferred upon them by the federal Constitution; but I submit, with all due respect, that not only the history and object of the section under consideration, but the proper definition of the term "Legislature," as therein used, show the fallacy of this construction. The "Legislature" of the state, in its fullest and broadest sense, signifies that body in which all the legislative power of a state reside, and that body is the people themselves, who exercise the elective franchise, and upon their power of legislation there is no limitation or restriction, except such as may be found in the federal Constitution, or such as they themselves may provide by the organic law of the state.' "

The writ was denied.

*State ex rel. Davis v. Hildebrant,* 94 Ohio St. 154, 114 N. E. 55, is likewise to the point. The general assembly, being the representative legislative body of the state of Ohio, passed an act on May 27, 1915, redistricting and apportioning the state into several Congressional districts. The state had theretofore, by an act passed April 28, 1913, been districted and divided. A sufficient number of the people filed a petition for a referendum of the later act. It was submitted to the electors of the state and was rejected by a majority of the voters. It was contended that the act of 1915 was a valid act and was not a subject of referendum, because sec. 4, art. 1 of the Federal constitution provided that the times, places and manner of holding elections for members of Congress, "shall be prescribed in each state by the legislature thereof." The court put the question:

"Does the term 'legislature,' as used in Article I, Section 4 of the Federal Constitution, comprehend simply the representative agencies of the state, composed of the members of the bicameral body, or does it comprehend the various agencies in which is lodged the legislative power to make, amend and repeal the laws of the state, including the power reserved to the people empowering them to 'adopt or reject any law' passed by the general assembly under the provisions of Section 1, Article II of the Constitution of Ohio?"

After reference to the state constitution, which is in form similar to the seventh amendment to our own, the court says:

"These various sections disclose that, while the legislative power has been delegated to the bicameral body composed of the senate and house of representatives, the people of Ohio have by the aforesaid provisions of their constitution determined the manner by which such legislative power may be exercised, under what circumstances the laws passed by it may be-

come operative without an appeal to the people, and have further imposed the conditions under which such laws may become operative or inoperative as they may have been adopted or rejected by the popular vote designated as the 'referendum.'

"While Article I, Section 4, of the United States Constitution is controlling upon the states in so far as it grants the legislature of the state authority to prescribe the times, places and manner of holding elections, this is the *quantum* of the federal grant. The character of the legislature, its composition and its potency as a legislative body are among the powers which are, by Article X of said Constitution, 'expressly reserved to the states respectively, or to the people.'

"Webster's New International Dictionary defines 'legislature' as follows: 'The body of persons in a state, or politically organized body of people, invested with power to make, alter and repeal laws.'

"The Century Dictionary defines the same term as follows: 'Any body of persons authorized to make laws or rules for the community represented by them.'

"Under the reserved power committed to the people of the states by the federal constitution, the people, by their state organic law, unhindered by federal check or requirement, may create any agency as its lawmaking body, or impose on such agency any checks or conditions under which a law may be enacted and become operative. Acting under this recognized authority, the Ohio constitution, prior to the adoption of the amendment of 1912, provided that the *'legislative power'* of the state should be vested in the general assembly, consisting of a senate and house of representatives. The same provision now exists, but by the adoption of the amendment of 1912 the people expressly limited this legislative power by reserving to themselves the power to reject any law by means of a popular referendum. The lawmaking body, the legislature, as defined by lexicographers, comprehends every agency required for the creation of effective laws. It cannot be claimed that the term 'legislature' necessarily implies a bicameral body. When the term was

originally embraced in the constitution the legislatures of Pennsylvania, Georgia and Vermont consisted of but a single house, with a second body in each, called an executive council. These states later abolished their councils and established a legislature consisting of two branches, and such is the character generally of the various state legislatures today. 1 Bryce's American Commonwealth, page 461, note.

"The constitutional provision relating to the election of congressmen, conferring the power therein defined upon the various state legislatures, should be construed as conferring it upon such bodies as may from time to time assume to exercise legislative power, whether that power is lodged in a single or two-chambered body, or whether the functions of the latter be curbed by a popular vote or its enactments approved by a referendum vote."

This case went to the supreme court of the United States. (*State ex rel. Davis v. Hildebrant,* 241 U. S. 565.) That court passed the question of the power of the state to adopt and use the referendum as an instrument of legislative will "as obvious," holding that the state law which had been made subject to the referendum was valid and operative; a conclusion manifestly unsound, if the word "legislature" means a bicameral body and that meaning is inflexible under the constitution of the United States; for, if that were so, the states would have no power to prevail against it, whatever the form of their expression may have been.

But it is said that the supreme court may be unsound in that respect, but is sound in result because the Congress had passed an act, ch. 5, 37 Stat. 13, making the referendum a component part of the legislative authority empowered to deal with the election of members of Congress. There is nothing in the act of Congress which

"prevents the people of a State from reserving a right of approval or disapproval by referendum of a state act redistricting the State for the purpose of congressional elections" (syllabus).

But if it were so, it would not avail respondent, for the power of the state to act comes from the constitution and not from any act of Congress. To give such effect to an act of Congress would be to say that Congress might by act amend the constitution. Chief Justice White disposed of the controversy when he defined the issue,

"The right to this relief was based upon the charge that the referendum vote was not and could not be a part of the *legislative* authority of the State and therefore could have no influence on the subject of the law creating congressional districts for the purpose of representation in Congress."

and said,

"The court below adversely disposed of these contentions and held that the provision as to referendum was a part of the legislative power of the State. . . . As to the state power, we pass from its consideration, since it is obvious that the decision below is conclusive on that subject and makes it clear that so far as the State had the power to do it, the referendum constituted a part of the state constitution and laws and was contained within the legislative power and therefore the claim that the law which was disapproved and was no law under the constitution and laws of the State was yet valid and operative, is conclusively established to be wanting in merit."

It could not have been so held if the act of a *legislature,* as distinguished from legislative authority, was essential under section 4. If that were so, the court must have denounced the referendum in that and all cases where the constitution leaves a matter to the

"legislature" and refused to follow the state court, for its first duty is to the constitution.

Our attention is called to a decision of the supreme court of Oregon in *Herbring v. Brown,* 180 Pac. 328. The premise of the decision is that the reserved power of the people is limited to a review of "any *act* of the legislative assembly," and that the word "act" was used having in mind the exercise of the legislative function as outlined in the original draft of the state constitution, and that the word "act" did not comprehend a joint resolution.

We have already demonstrated that our constitution is more comprehensive. The decision does not appeal to us for another reason. Its basis is fundamentally unsound in that it proceeds upon the theory that the right of the people to legislate upon the question rests in the antecedent provisions of the state constitution, whereas the right comes from the constitution of the United States.

Other questions were discussed by counsel. We have considered them and are agreed that they are not controlling.

The writ will issue.

MOUNT, MAIN, and HOLCOMB, JJ., concur.

PARKER, J. (dissenting)—I am unable to concur in the majority opinion of the court. The necessity of a prompt disposition of this case, in view of the decision of a majority of the court to grant the writ prayed for, prevents me setting forth, at the length I would like to, my views upon the question presented. I will content myself with the following brief observations, which I think could be materially strengthened in support of the conclusions I have reached, by a more detailed discussion.

The resolution of Congress here in question, reads:

## "JOINT RESOLUTION.

"Proposing an amendment to the constitution of the United States.

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each house concurring therein), That the following amendment to the constitution be, and hereby is, proposed to the States, to become valid as a part of the constitution when ratified by the Legislatures of the several States as provided by the constitution:

## "ARTICLE —.·

"Section 1.    After one year from the ratification of this article the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all territory subject to the jurisdiction thereof for beverage purposes is hereby prohibited.

"Sec. 2.    The Congress and the several states shall have concurrent power to enforce this article by appropriate legislation.

"Sec. 3.    This article shall be inoperative unless it shall have been ratified by an amendment to the constitution by the legislatures of the several states, as provided in the constitution, within seven years from the date of the submission hereof to the States by the congress."    U. S. Stats. 1918, Sess. II, ch. 212, 40 Stat. 1050.

The constitution of the United States, in the fifth article thereof, prescribes the manner of proposing and ratifying amendments to that instrument as follows:

"The Congress, whenever two-thirds of both Houses shall deem it necessary, shall propose amendments to this Constitution, or, on the Application of the Legislatures of two-thirds of the several States, shall call a Convention for proposing Amendments, which, in either case, shall be valid to all intents and purposes,

as part of this Constitution, when ratified by the Legislatures of three-fourths of the several States, or by Conventions in three-fourths thereof, as the one or the other mode of ratification may be proposed by the Congress; . . ."

In the sixth article of that instrument, we also read:

"This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding."

It is therefore plain that the above quoted portion of the fifth article of the Federal constitution is the supreme law of the land touching the subject of amending that instrument. The several states, by the express provisions of that article, have as completely surrendered the power to prescribe a different manner of amending the Federal constitution as they have surrendered to the Federal government the sovereign powers enumerated in that instrument to be exercised by the Federal government. It is to be noted that the Congress of the United States has the power to prescribe either of two ways in which the several states shall voice their ratification of a proposed amendment to the Federal constitution, to wit: "by the legislatures," or "by conventions" held in the several states for that purpose; and that Congress has in its proposal of this amendment expressly provided that it "shall be inoperative unless it shall have been ratified as an amendment to the constitution by the legislatures of the several states . . ." In other words, Congress has submitted this proposed amendment for ratification or rejection to the legislatures of the several states, instead of to conventions to be held therein.

It is contended in behalf of the relator that the word "legislatures," as used in the above quoted portion of the fifth article of the Federal constitution, means not alone the law-making representative body of the several states, called "legislature" or some other name of the same import, but the entire law-making body of the state, though such body include the individual electors of the state, when by its constitution such electors possess the power of direct legislation through the initiative and referendum, as they do in the state of Washington under its constitution by virtue of the seventh amendment thereto, reading, in so far as we need here notice its language, as follows:

"The legislative authority of the state of Washington shall be vested in the legislature, consisting of a senate and house of representatives, which shall be called the legislature of the state of Washington, but the people reserve to themselves the power to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature, and also reserve power, at their own option, to approve or reject at the polls any act, item, section or part of any bill, act or law passed by the legislature."

I am convinced that the ratification by a state legislature of a proposed amendment to the Federal constitution is an exercise of a power which the legislature possesses by virtue of the fifth article of that instrument, and the designation by Congress of that method of ratification in pursuance of the power given to Congress by that article, and that the legislature is not acting in pursuance of any power given to it by the state constitution, except in so far as the legislature may owe its existence to the state constitution. I cannot escape the conclusion that such act of ratification by the legislature is not law-making legislation for the state and its people under its constitution, but

is simply the casting of the vote of the state and its people in the manner prescribed by the Federal constitution and the direction of Congress made in pursuance thereof, as to whether or not the proposed amendment of that instrument shall be ratified. Such act of a state legislature, it may be conceded, is an act or participation in legislation; but I think it is an act of participation in purely national legislation, and is neither state legislation, nor an act of participation in state legislation. I may further observe that the act of ratification would, as I view it, be in substance identical in character, whether done by the legislature by a vote upon an informal motion, by a formal resolution, or by a formal bill as in the enactment of ordinary state laws; and that the form of ratification by the legislature is of no moment in the determination of whether or not the legislative act of ratification is referable to a direct vote of the people. Of course, the legislature might call for an advisory vote of the people before finally acting, but that is not this case.

In Jameson, Constitutional Conventions (4th ed.), § 583, that learned author says:

"The power of a state legislature to participate in amending the Federal Constitution exists only by virtue of a special grant in that constitution. It is a power which it could not assume under any notion of a general right to legislate, for that right is confined within state limits, and to the enactment of ordinary laws."

Our problem here is, What body of persons compose the legislature, within the meaning of that word as used in the fifth article of the Federal constitution? rather than the question of where the whole of the state's legislative power resides. Recurring to the language of that article, and having in mind what

must have been the commonly accepted meaning of
the word "legislature" when originally placed in that
article of the constitution, I am convinced that it
means that body of persons composing the ordinary
representative law-making body of the state. The
fact that Congress is given power to submit proposed
constitutional amendments to conventions, manifestly
meaning representative conventions, in the several
states, as well as to the legislatures thereof; the man-
ner in which the several states and their people ex-
press their choice for president and vice-president of.
the United States through chosen representatives
called electors, instead of by direct vote; the manner
in which the several states expressed their choice for
United States senators through chosen members of
their respective representative law-making bodies
called "legislature," or some other name of the same
import, as provided by the Federal constitution until
recent years; the fact that the Federal constitution,
until the recent amendment thereto providing for the
election of senators by direct vote of the people, never
contained any provision for the people of the respec-
tive states voicing their will by direct vote upon any
Federal or national question wherein the decision of
a state, or the people thereof as a whole, was called
for under some provision of the Federal constitution;
and the history of the times touching the original
framing and adoption of the Federal constitution, to
my mind argue all but conclusively that it was not the
intent or purpose of the framers of that instrument
that amendments thereto should be ratified by the
several states or the people thereof, other than by an
expression of their will in that behalf through their
representative legislative bodies called "legislature,"
or some other name of the same import, or through

representative conventions held in the several states for that purpose.

Counsel for the relator call to our attention and invoke in his behalf the decisions of the supreme court of South Dakota and Ohio, in *State ex rel. Schrader v. Polley,* 26 S. D. 5, 127 N. W. 848, and *State ex rel. Davis v. Hildebrant,* 94 Ohio St. 154, 114 N. E. 55, holding, in substance, that the word "legislature," as used in section 4 of article 1 of the Federal constitution, means and comprehends the entire legislative power of the respective states, including not only the legislative power possessed by the representative legislative body of each state, but also the legislative power which may be reserved in the people of a state by its constitution, to be exercised by the initiative and referendum, as such power is reserved in the people of South Dakota and Ohio by their constitutions, in substance the same as such power is reserved in the people of our state by the above quoted portions of the seventh amendment to our constitution. Section 4 of article 1 of the Federal constitution, the interpretation of which was involved in those decisions, reads:

"The times, places and manner of holding elections for senators and representatives, shall be prescribed in each state by the legislature thereof; but the congress may at any time by law make or alter such regulations, except as to the places of choosing senators."

The question in each of those cases was as to whether or not an act passed by the representative legislative law-making body of the state, called "legislature" in South Dakota, and "general assembly" in Ohio, dividing the state into congressional districts and providing for the election of representatives in Congress therefrom, was subject to a referendum vote of the people of the state under the initiative and ref-

erendum provision of its constitution; those courts deciding that such an act was subject to a referendum vote of the people. It seems to me at once apparent that there is a marked distinction between the legislative power reserved to the several states by the provisions of section 4, article 1, of the Federal constitution, and the provisions of article 5 of that instrument, providing the manner in which the respective states and the people shall express their ratification of proposed amendments to that instrument. The former is the enactment of law, the prescribing of a rule of conduct, by the sovereign legislative power of the state, subject, of course, to be superseded by laws which may be enacted by Congress, but nevertheless within itself an act of legislation, completed or to be completed by the sole legislative power of the state; and the fact that such legislation may have to give way to some higher law which Congress may enact, does not in the least change the fact that it is an act done by the legislative power of the state, in the doing of which no other state or power has any voice whatsoever. The latter is but the casting of the vote of the state and its people upon the question of amending the Federal constitution, in the manner provided for by the terms of that instrument; a question not of state legislation, but of national legislation, in which each state has but one vote. I think that the South Dakota and Ohio decisions are of no controlling force in the solution of this problem.

It has been suggested that a state constitution might not create any representative law-making body such as is commonly called "legislature," but provide for the exercise of the whole of the state's legislative power by direct vote of the people, a thing I concede to be not impossible; and that such a state might de-

cline to provide for the calling of a convention to act upon a proposal to amend the Federal constitution. I am quite unable to see, should my view of the question here presented prevail, that such a condition would in the least impair the right and power of Congress to obtain, in an orderly and lawful way, an expression of the will of the people of such a state touching a proposed amendment to the Federal constitution, since Congress is plainly given the power to submit such a proposal to conventions in the several states and to provide the manner of electing delegates to, and the calling of, such conventions, all of which could be readily done by Congress wholly apart from state constitutional and statutory law.

It is contended in behalf of the relator that the secretary of state should not now be permitted to refuse to file the petition, give a serial number thereto as a referendum measure, transmit a copy thereof to the *Attorney General* for the preparation of a ballot title, and perform the other acts required of him by law looking to the submission of referendum measures to the people; and that we should not at this time entertain the defense made in the secretary's behalf that the proposed measure is not referable to the people. Counsel for the relator call to our attention and rely upon that line of decisions holding, in substance, that the courts will not entertain the question of the constitutionality or validity of a proposed initiative or referendum measure in a proceeding to compel an officer to perform, or refrain from performing, some act prescribed by law to be performed by him looking to the submission of such measures to the people.

Our real concern here is not with the constitutionality or validity of the joint resolution of our legislature here in question. The real reason why the secretary of state should not be compelled to perform

the acts demanded of him by the relator is that the question of the ratification of a proposed Federal constitutional amendment is not one to be finally decided by direct vote of the people of the several states, but by the vote of the states and the people thereof, expressed through their representative law-making bodies or representative conventions held in the several states for that purpose. No decision of any court has come to our notice holding that an officer whose duty it is to perform acts looking to the submission to the people of initiative and referendum measures can be compelled by mandamus to perform any act looking to the submission of a question to the people which under no circumstances is referable to a direct vote of the people for final decision as an initiative or referendum measure. The demand here made by the relator upon the secretary of state is, in its last analysis, a demand that he perform an act which I think he is not legally required to perform. Our decision in *State ex rel. Case v. Howell*, 85 Wash. 281, 147 Pac. 1162, and *State ex rel. Case v. Howell*, 85 Wash. 294, 147 Pac. 1159, Ann. Cas. 1916A 1231, are in harmony with this view of the law, though this exact question was not there presented to the court.

I am of the opinion that the writ should be denied.

Mitchell, J., concurs with Parker, J.

Tolman, J. (dissenting)—I thoroughly and heartily agree with the construction placed upon our state constitution by the majority, but am convinced that the question here involved is one upon which our state constitution and laws have no bearing, and that the manner of amending the Federal constitution is fixed by that instrument itself. I therefore concur with Judge Parker.

FULLERTON, J. (dissenting)—While I concur in the conclusion reached by Judge Parker, I do so for a very different reason than the reason given by him. I am of the opinion that there has been no valid ratification of the proposed constitutional amendment. If this view be sound, it follows, as matter of course, that there is nothing to submit under the referendum clause of the constitution to the vote of the electorate.

I need not state at length the reasons which lead me to think there has been no valid ratification of the amendment. It is sufficient to say that, in my opinion, the term "legislature," as used in the fifth article of the Federal constitution, has reference to the legislative power of the state, not to that part of the legislative power technically designated in the constitution as the legislature. The two houses of the legislative branch of the state government cannot, therefore, ratify a proposed amendment to the Federal constitution by a joint resolution; this for the reason that they do not constitute the sole legislative power. The governor, by his right of approval or disapproval of legislative enactments, and the people, through the referendum, constitute a part of that power, and the participation of the one in every instance, and the participation of the other if it so desires, is necessary to the passage of laws. That the ratification of the proposed amendment is the enactment of a law seems to me only necessary to be stated to be conceded. It is a surrender of a part of the sovereignty of the state, and it makes that law in the state which was not law before. The state constitution points out the procedure for the enactment of laws. That procedure has not been followed in this instance; hence my conclusion that there has been no valid ratification of the amendment.

I am aware that the majority meet my objection by arguing that the power to amend the constitution of the United States emanates from that constitution, and since it prescribes no form for state action, any suitable form may be adopted which expresses the will of the state. But this line of reasoning overlooks the language of the constitutional provision authorizing amendments. As shown in both the majority and dissenting opinions, the Congress, in submitting proposed amendments to the constitution for ratification by the states, may adopt either one of two methods for such ratification; it may submit the amendment to the legislatures of the several states, or it may submit it to conventions of the several states.

If the majority contention be sound, a submission to the legislature would be legally ratified if ratified by a convention, and if submitted to a convention, would be legally ratified if ratified by the legislature. This form of reasoning is, to my mind, unsound.

I think, instead of waiving form, form is expressly insisted upon; and since the submission is in this instance to the legislature, the legislature must act in the manner it is empowered to act by the laws creating it, else there is no valid ratification.

That I am not alone in this view is shown by the cases supporting it cited by the majority. I cannot agree with the majority, however, in thinking them unsound. To my mind, the reasoning upon which they are founded is unanswerable.

I think the writ should be denied.

MACKINTOSH, J. (concurring)—By the adoption of the initiative and referendum amendments the people of this state became a part of the legislative branch of the state government, and all legislative actions, except those especially exempted, are subject to their

participation. The reasons which have led up to this modern form of legislation are as set forth in Judge Chadwick's opinion and, upon both authority and reason, no curtailment of this power should now be judicially sanctioned. If the people have declared their intention to assert their authority over the legislature in acts many of which are of temporary or small importance, it was surely their intention to preserve to themselves the right of reviewing legislative action of lasting and great importance, and within this category assuredly fall all actions dealing with the amendment of the Federal constitution. It would be idle to say that the right of referendum could be exercised in the unimportant matters and not in the important.

The dissenting opinion of Judge Parker indulges in altogether too narrow and restricted an interpretation of the right of referendum, and seems to be entirely out of harmony with the course of the decisions of this court upon this and kindred matters arising under laws affecting modern legislative and governmental functions. By strict adherence to dictionary definitions, this dissenting opinion crushes the spirit of the constitutional provisions under consideration, and if it were the prevailing view in this case, would mark a step backward by a court which has come to be recognized as rather liberal in its interpretation of legislation aimed at the correction of social and public evils. It is clear to my mind that the law contemplated the submission to the people of all legislative acts, using that word in its broad signification, and it is also clear that the constitution of the United States, in providing for amendments thereof, intended that those amendments should by Congress be submitted to the legislative powers of the various states, and that the term "legislature," as used in that broad way, was not

meant to refer merely to what is commonly called a legislature.

The view expressed by Judge Fullerton appears to me to be equally as untenable as those written by Judge Parker and those agreeing with him. As I understand it, that view is that because the legislature ratified the proposed constitutional amendment by joint resolution instead of by an *act*, that therefore there has never been any ratification by the state of Washington of the proposed prohibition amendment. The answer to this has been admirably expressed in the majority opinion, and it would appear to be self-evident that the technical manner of signifying the agreement of the legislative body is a question which should be determined by the Congress of the United States and is not a matter of our concern.

I am compelled by the majority opinion to concur in the result therein arrived at.