[No. 30885.   *En Banc.*   February 4, 1949.]

FRANK A. GILMAN, *Appellant*, v. THE STATE TAX COMMISSION *et al.*, *Respondents.*[1]

*Monheimer, Schermer & Mifflin*, for appellant.

*The Attorney General* and *Lyle L. Iversen, Assistant*, for respondents.

HILL, J.—This is an action challenging the constitutionality of initiative measure No. 169, which received a favorable vote of the electorate in November, 1948. It provides for payment by the state of Washington of ten dollars a

[1]Reported in 202 P. (2d) 443.

month for services within the continental United States and fifteen dollars a month outside thereof, to residents of this state as members of the armed military and naval forces of the United States between December 7, 1941, and September 2, 1945. The money is to be raised by issuing and selling bonds of the state in the sum of one hundred million dollars, to bear three per cent interest and to be payable in not to exceed thirty years. For the purpose of creating a fund for the retirement of the bonds and the payment of interest thereon, a ten per cent tax is to be levied on the retail selling price of all tobaccos.

The complaint asks that the collection of the tax by the state tax commission and the issuance of the bonds by the state finance committee be restrained. A demurrer to the complaint was sustained, and the action dismissed. This appeal followed.

It is apparent that the indebtedness to be incurred is in excess of the four-hundred-thousand-dollar limitation to indebtedness fixed by Art. VIII, § 1, of our state constitution. Sections 2 and 3 of that article provide exceptions to that debt limitation. Section 3, under which the World War I equalized compensation legislation was submitted to the people (see Laws of 1920, Ex. Ses., chapter 1, § 13, p. 14), provides for the incurring of indebtedness by the state "for some single work or object," but only if the law providing therefor has been submitted to and approved by the people at a general election. It further provides that such a law

" . . . shall provide ways and means, exclusive of loans, for the payment of the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty years from the time of the contracting thereof. . . ."

█ The World War I bonds for equalized compensation were brought squarely within Art. VIII, § 3, and contained the provision that each bond should be made payable at a time not exceeding twenty years from the date of its issuance. World War II bonds for equalized compensation are placed squarely outside of Art. VIII, § 3, by the provision that each of such bonds shall be made payable at a time not

exceeding thirty years from the date of its issuance.

This initiative measure being thus explicitly placed outside of Art. VIII, § 3, its proponents say that Art. VIII, § 2, of the state constitution is applicable. That section reads as follows:

"In addition to the above limited power to contract debts, the state may contract debts to repel invasion, suppress insurrection, or to defend the state in war, but the money arising from the contracting of such debts shall be applied to the purpose for which it was raised, and no other purpose whatever."

*State ex rel. Hart v. Clausen*, 113 Wash. 570, 194 Pac. 793, 13 A. L. R. 580, and *State ex rel. Hart v. Clausen*, 117 Wash. 260, 201 Pac. 30, were test cases involving the validity of the bonds issued under the veterans' equalized compensation act of 1920. It is urged by the respondents here that in those cases we held that the indebtedness for the equalized compensation of veterans of World War I was within the purview of Art. VIII, § 2.

The first of the two cases, decided in January, 1921, did not even refer to the constitutional question or provision now under discussion. The act passed by the special session of the legislature in March, 1920, specifically provided ( § 13) that it should be

". . . submitted to the people for their ratification at the next general election in accordance with the provisions of section 3, of Article VIII of the State Constitution. . . ."

The court there said:

"The question in the case is the constitutionality of the law referred to. It is argued by the respondent that the act is unconstitutional because, under its provisions, money is to be raised by taxation for a private purpose. The petitioners argue that the acts should be sustained because the money to be expended under its provision is for a public purpose. The pivotal and controlling question, then, is whether the purpose for which the money is to be devoted under the act is public or private."

The question was answered by a holding that the expenditure involved was for a public purpose, which could be

met by general taxation; and, in accordance therewith, the bonds were issued and sold.

The second case, the one reported in 117 Wash., arose some seven and one-half months later. The court very succinctly stated the sole question which there confronted it:

"The sole question in this case is whether or not ch. 1, Laws of 1920, p. 7, is sufficient authorization for the issuance of bonds of the state in excess of $11,000,000. The question arises by reason of § 6, p. 11, of the act, which contains the following provisions:

" 'For the purpose of providing means for the payment of compensation hereunder and for paying the expenses of administration there shall be issued and sold bonds of the State of Washington in the sum of Eleven Million Dollars ($11,000,000): *Provided,* That if the proceeds of the sale of such bonds be insufficient to pay the compensation herein allowed, then sufficient additional bonds to pay such compensation shall be issued and sold. The issuance, sale and retirement of said bonds shall be under the general supervision and control of the State Board of Finance.'

"Bonds to the amount of eleven million dollars have been issued and sold by the state and the funds derived therefrom have been practically exhausted in the payment of warrants. Additional bonds have been authorized and a block of them bid in by the finance committee as an investment for the permanent school fund. The state auditor has refused to issue warrants on the school fund in payment of the bonds, and this action is brought to compel him so to do.

"The respondent predicates his position upon the ground that there is a constitutional inhibition against the action of the committee."

The court, having thus posed the sole question, *i. e.,* the sufficiency of § 6 of the act to authorize the issuance of bonds of the state in excess of eleven million dollars, answered the question in these words:

"Having determined that the creation of the indebtedness involved in this act was valid under our constitutional limitations, we are confident that the proviso in § 6 of this act for the issuance of additional bonds, if the eleven million dollars authorized be found insufficient, is also valid. There is no delegation of legislative power in that proviso, but merely an authorization to ascertain that which may be made certain by public records, and to issue additional

bonds upon such determination. There is no exercise of discretion involved. It is simply a mathematical proposition and a mandate to issue sufficient bonds to satisfy all the demands. The authority is clear."

The court did make some entirely unnecessary reference to Art. VIII, § 2, in the course of that opinion. It said:

"We have heretofore decided, in *State ex rel. Hart v. Clausen*, 113 Wash. 570, 194 Pac. 793, that the act in question is valid as a constitutional act in that it was for a public purpose. While § 2, art. 8, of the constitution of Washington was not particularly referred to as authority supporting the constitutionality of the law, it is manifest that when it was decided that the payment of the funds provided for by the Veterans' Compensation Act as being for a public purpose brought it within that section, and § 3, art. 8, having been conformed to, no other provision of the constitution stood in the way."

The statement that, when it was decided that the payment of the funds was a public purpose, the act was brought within Art. VIII, § 2, is not only dictum but a complete *non sequitur*; there are many public purposes outside of Art. VIII, § 2.

The court also said:

"There is no limitation imposed upon the amount of debt that may be contracted for the purposes contemplated by subd. 2, art. 8, of the constitution. The legislature, the people approving at the referendum, contracted the indebtedness, and the evident intention of the legislature and the people was that every veteran entitled to the amount fixed by the act should be provided for."

The purpose of that statement was apparently to make clear that there is no limitation on the amount of debt that may be incurred for equalized compensation. It was not necessary to rely upon Art. VIII, § 2 (referred to as "subd. 2" in the foregoing quotation); it could have been said, with equal accuracy and far more appropriately, that there is no limitation imposed upon the amount of debt that may be contracted for the purposes contemplated by Art. VIII, § 3, of the constitution.

The court also cited and quoted from the case of *Gustafson v. Rhinow*, 144 Minn. 415, 175 N. W. 903. The constitutional provision there involved was as follows:

"The state shall never contract any public debt, unless in time of war, to repel invasion or suppress insurrection, except in the cases and in the manner provided in the fifth and sixth sections of this article." Art. IX, § 7, constitution of Minnesota.

The soldiers' bonus law of Minnesota was passed in 1919, and provided for the payment to Minnesota citizens in the armed forces of fifteen dollars for each month or fraction thereof of service after April 6, 1917, "and prior to the date upon which peace shall be agreed upon between the United States and the German Government." (Laws of Minnesota for 1919, Ex. Ses., chapter 49, § 2, p. 73.) The court pointed out that a state of war still existed at the time of the passage of the act, and that it was for a proper military purpose *in time of war*. There was no contention that the debt was contracted to repel invasion or to suppress insurrection.

In Washington, debts may be contracted "to defend the state in war"; and in Minnesota, they may be contracted "in time of war." The Minnesota court said:

"It is not to be inferred, however, that section 7 [of Art. IX, constitution of Minnesota] authorizes the incurring of a public debt, in time of war, for all purposes. The debt must be for a public purpose, as a matter of course, but it also must be for a purpose having some reasonable connection with the conduct, offensive or defensive, of the war in question; it must be for some legitimate military or naval purpose pertaining to *the existing state of war*. Any other interpretation would invite serious excesses." (Italics ours.)

It is apparent that the Minnesota case relied upon did not strengthen the dictum from *State ex rel. Hart v. Clausen*, 117 Wash. 260, 201 Pac. 30, on which the respondent relies. We find nothing in either of our cases of *State ex rel. Hart v. Clausen* that would preclude us from facing, as a matter of first impression, the question of whether the bond issue here contemplated comes within the provisions

of Art. VIII, § 2, of our state constitution. It seems too obvious to merit discussion that the debt to be contracted as provided by initiative measure No. 169 to equalize compensation between December 7, 1941, and September 2, 1945, is not—however meritorious the motive—contracted to (1) repel invasion, (2) suppress insurrection, or (3) defend the state in war.

Because of the importance of the question presented, we have made a survey of the constitutional provisions of the other forty-seven states and their history with reference to bonus or equalized compensation legislation. Thirty-five other states have constitutional provisions somewhat similar to Art. VIII, § 2, of our constitution. Significantly, seventeen, or practically half of those states, have no bonus or equalized compensation legislation, and ten others amended their constitutions so that such legislation might be enacted; thus twenty-seven, or practically four fifths of the states having similar constitutional provisions, either have no equalized compensation legislation or have amended their constitutions to make it possible. The situation in the remaining eight states, which have enacted such legislation without amending their constitutions, will be reviewed.

Minnesota: We have already discussed *Gustafson v. Rhinow*, 144 Minn. 415, 175 N. W. 903, and have shown that the decision was based squarely on the proposition that the United States was still at war, and that the equalized compensation bonds came under a provision providing for the contracting of public debt "in time of war."

Wisconsin: In *State ex rel. Atwood v. Johnson*, 170 Wis. 218, 175 N. W. 589, 7 A. L. R. 1617, and *State ex rel. Atwood v. Johnson*, 170 Wis. 251, 176 N. W. 224, World War I bonus legislation was upheld; but the Wisconsin court pointed out that the sections of the constitution controlling the contracting of any public debt by the state had no applicability because no bond issue was involved and no debt was created.

Illinois: In *Hagler v. Small*, 307 Ill. 460, 138 N. E. 849, the Illinois supreme court had before it the validity of a

fifty-five-million-dollar bond issue for adjusted compensation for veterans of World War I. A portion of Art. IV, § 18, of the Illinois constitution reads as follows:

" . . . *Provided,* the state may, to meet casual deficits or failures in revenues, contract debts, never to exceed in the aggregate $250,000; and moneys thus borrowed shall be applied to the purpose for which they were obtained, or to pay the debt thus created, and to no other purpose; and no other debt, except for the purpose of repelling invasion, suppressing insurrection, or defending the state in war, (for payment of which the faith of the state shall be pledged,) shall be contracted, *unless the law authorizing the same shall, at a general election, have been submitted to the people, and have received a majority of the votes cast for members of the general assembly at such election. The general assembly shall provide for the publication of said law for three months at least before the vote of the people shall be taken upon the same; and provision shall be made, at the time, for the payment of the interest annually, as it shall accrue, by a tax levied for the purpose or from other sources of revenue; which law, providing for the payment of such interest by such tax, shall be irrepealable until such debt be paid: and, provided further, that the law levying the tax shall be submitted to the people with the law authorizing the debt to be contracted.*" (Italics ours.)

It will be noted that Illinois in the one section covers three situations: *i. e.,* (1) a limitation on debt to a nominal amount for casual deficits or failures in revenue; (2) authority to incur debt in the event of war, invasion, or insurrection, in an unlimited amount and without any vote of the people; (3) authority to incur debt in an unlimited amount on a vote of the people, if provision is made at the same time for payment of the interest thereon as it accrues.

The Illinois court upheld the bond issue on the basis of the italicized portion of the constitutional provision, just as we did in the case of World War I equalized compensation on the basis of Art. VIII, § 3, of our constitution, but forthrightly rejected any contention that the war, insurrection, or invasion provisions had any application, saying:

"The state was not engaged in war, repelling invasion or suppressing an insurrection when the General Assembly passed and submitted to the people the act in question, nor

was it threatened with such calamity. This act is not to be sustained on such ground."

Iowa, Massachusetts, New Jersey, and North Dakota: We find no cases in which the validity of the equalized compensation legislation has been challenged because of the constitutional provision here involved. That is easily understood, because in Iowa, Massachusetts, and New Jersey, there are constitutional provisions almost identical to Art. VIII, § 3, of the Washington constitution, under which such legislation could be enacted without having any question raised as to whether the indebtedness was to be incurred for repelling invasion or putting down insurrection, or for the defense of the state in time of war. As was said in *Grout v. Kendall*, 195 Iowa 467, 192 N. W. 529, speaking of a provision similar to Art. VIII, § 3, of the Washington constitution, being Art. VII, § 5, of the Iowa constitution:

"Under Section 5, a wide door and an open sky are offered, provided that the indebtedness created thereunder shall be approved by a referendum to the electorate. No maximum is fixed."

It was because the proponents elected to go through that "wide door" that the Iowa World War I bonus legislation was upheld.

Kansas: This is the only one of all these states in which a court has said that a bond issue for the purpose of providing payment for past services rendered during a war comes within such a provision limiting the state's authority to borrow money "to repel invasion, suppress insurrection, or defend the state in time of war." (Art. XI, § 7, constitution of Kansas.) The supreme court of Kansas, in *State ex rel. Griffith v. Davis*, 113 Kan. 4, 213 Pac. 171, said:

"There is no threatened invasion of Kansas; there is no insurrection in this state; and the money to be raised is not to be expended to defend the state in time of future war. The World War is over, but it was very real in 1917 and 1918. If the central powers had won, no man can tell how soon we would have been fighting in our own state for the preservation of our institutions. We were defending Kansas in France as much as we would have been defending Kansas if the armies had been facing each other in New

York, or across the Mississippi or Missouri rivers, or on the prairies in our own state. It was our good fortune that we could fight in Europe instead of the United States, but that does not detract from the fact that we were fighting in defense of our own rights. It was the necessity for that defense that compelled us to enter the war; it was that defense that kept us at the front; and when the need of that defense ceased, we stopped fighting. The expense incurred comes within section 7 of article 11 of the constitution of this state."

With the rhetoric and sentiment expressed, we have no quarrel; but we do not find the reasoning sufficiently persuasive to warrant disregarding the clear language of our constitution.

On the basis of this research, we remain of the opinion that the debt to be contracted is not (1) to repel invasion, (2) to suppress insurrection, or (3) to defend the state in war. It follows that the demurrer to the complaint should not have been sustained, and that the appellant's complaint should not have been dismissed.

Numerous other questions were presented which need not be discussed here, but it may be stated in passing that a majority of the court is also of the opinion that the ballot title was not sufficiently broad to make the bonds, if they had been constitutional, a general obligation of the state of Washington.

ALL CONCUR.