[No. 42959. En Banc. February 22, 1974.]

CLEM A. YELLE et al., Petitioners, v. A. LUDLOW KRAMER, as Secretary of State, et al., Respondents.

*John F. Dore,* for petitioners Yelle and Chatalas.

*Kane, Vandeberg & Hartinger,* by *Elvin J. Vandeberg* and *Charles E. Jett,* for petitioners Johnson and Cole.

*Slade Gorton, Attorney General, Philip H. Austin, Deputy, Wayne L. Williams* and *James M. Vache, Assistants,* and *Alfred J. Schweppe* and *Kenneth D. Hansen, Special Assistants,* for respondents.

*LeSourd, Patten, Fleming & Hartung, Leon C. Misterek,* and *Williams, Lanza, Kastner & Gibbs,* by *William J. Leedom,* amici curiae.

### FOREWORD

WEAVER, C.J.*—When each member of the Washington State Supreme Court announced his disqualification because of a personal interest in the decision to be made in this case, it was submitted to a pro tempore Supreme Court composed of two retired Supreme Court justices and seven retired Superior Court judges.

In 1962, amendment 38 was added to article 4 of our state constitution. It provides:

When necessary for the prompt and orderly administration of justice a majority of the Supreme Court is

*Justice Weaver is serving as Chief Justice pro tempore of the Supreme Court pursuant to Const. art. 4, § 2(a) (amendment 38).

empowered to authorize judges or retired judges of courts of record of this state, to perform, temporarily, judicial duties in the Supreme Court . . .

Superior and Court of Appeals judges could not be designated to serve in the Supreme Court, for this case involves the salary of every active judge of a court of record in the state; hence, they, too, were disqualified for personal interest.

How the personnel of the pro tempore Supreme Court was determined is not an issue.[1]

## FACTS

This is an original proceeding in mandamus in the Supreme Court against elective state officers, Const. art 4, § 4. From an agreed statement of facts (ROA I-58(b)), and from those facts of which we may take judicial notice, we find the situation before us to be this:

The 1973 first extraordinary session of the legislature passed chapter 137, an appropriation bill. It contained an emergency clause; it was signed by the Governor April 24, 1973. Section 110 thereof increased the compensation of all state elected officials and of all judges of courts of record. The increased salaries were not to commence until January

---

[1] In short, the pro tempore Supreme Court was selected as follows: the name of each retired judge of a court of record, not practicing law, was placed in a blank envelope; counsel in the case alternately drew from a large bowl nine envelopes which were numbered as drawn. A second group of nine was then drawn and numbered in the same manner. These constituted possible alternates.

The Clerk of the Supreme Court immediately contacted the judges seriatum whose names had been drawn. The first three declined to act for personal reasons; the next could not be reached within the time limit—he was traveling someplace in Europe; the next two agreed to serve; the seventh declined; the next two accepted.

The panel of nine was completed from the alternates in the same manner.

All nine justices of the Supreme Court then signed an order appointing the justices pro tempore thus selected.

The geographic distribution of justices is excellent. There is one justice pro tempore from eastern Washington, one from north central, two from northwestern Washington, two from Seattle, one from across Puget Sound, and two from the capital city.

1, 1974.[2] Increased compensation of legislators could not be effective until after their reelection to office. Retirement deferred compensation of retired judges was not affected.

The refusal of the Secretary of State to accept for filing documents providing for a popular referendum of section 110 resulted in *State ex rel. Helm v. Kramer,* 82 Wn.2d 307, 510 P.2d 1110 (1973). The Supreme Court held that section 110 was not subject to the referendum.

June 12, 1973, initiative measure 282, pursuant to the constitution, article 2, section 1(a), was filed in the office of the Secretary of State. July 6, 1973, the sponsors of the initiative filed sufficient signatures to place it on the ballot for consideration by the voters.[3]

The ballot title of initiative measure 282, as issued by the Attorney General, pursuant to RCW 29.79.040, and as it appeared in the voters' pamphlet, was:

Shall state elected officials' salary increases be limited to 5.5% over 1965 levels, and judges' the same over 1972 levels?

The preamble of the initiative states:

BE IT ENACTED, by the people of the State of Washington:

Section 1. Section 110, chapter 137, Laws of 1973 1st ex. sess. is amended to read as follows:

Since the content of initiative measure 282 is not an issue, it is sufficient to say that it raises existing compensation of those involved, commencing January 1, 1974, but the raises are substantially less than the increased compensation fixed by Laws of 1973, 1st Ex. Sess., ch. 137, § 110.

September 17, 1973, a taxpayer and a member of the legislature (who cannot benefit by the pay raise until after his reelection) commenced this action by filing their petition for writ of prohibition, or, in the alternative, for writ to correct election error. They asked that the Secretary of

_____

[2]Since November 1968, salary raises of officials *who do not fix their own compensation* are permitted during the officials' term of office. Const. art. 30, § 1.

[3]The law required 117,902 supporting signatures. The sponsors of the initiative filed 699,098 supporting signatures.

State reject the initiative, desist from certifying it to county auditors for the ballot, or show cause why he should not do so.

September 17, 1973, the Attorney General, representing respondent, filed a motion to dismiss, noting it for argument before the Supreme Court on October 5, 1973.

Shortly thereafter, the entire Supreme Court announced its disqualification, provided for the implementation of a pro tempore Supreme Court, and set the argument on the motion to dismiss and the argument upon the merits before a pro tempore Supreme Court on January 10, 1974. Date of argument was, of course, *after* the general election to be held November 6, 1973.

The electorate passed initiative measure 282[4] and, on December 6, 1973, the Governor proclaimed its enactment.

The pro tempore court permitted the joinder of a state elected official and an active member of the judiciary as additional petitioners. Their salaries are involved in this litigation.

After argument on December 7, 1973, before a department of the pro tempore court, the State Treasurer was made a party respondent.

The pro tempore court specifically reserved determination of the ultimate constitutional issues upon the merits. In addition, it ordered that the State Treasurer be (a) restrained, pendente lite, from paying salaries pursuant to section 110, chapter 137, Laws of 1973; (b) directed to pay compensation for the month of December 1973, in accordance with the pay schedule in effect in November 1973; and (c) ordered to pay salaries thereafter in accordance with the schedule contained in initiative measure 282, pendente lite, because *both* enactments increased the compensation after December 31, 1973.

Since this cause is an original proceeding in this court, we do not have assignments of error to consider, but are

---

[4]For initiative measure 282: 798,338 votes.
Against initiative measure 282: 197,795 votes.

governed by the various contentions of petitioners and respondents directed to the primary question—the constitutionality of initiative measure 282.

The electorate, in 1912, added amendment 7 to our state constitution that provided for the initiative and referendum. Its political history and the impact of the amendment upon the law of this state have been discussed exhaustively in *State ex rel. Brislawn v. Meath*, 84 Wash. 302, 147 P. 11 (1915); *State ex rel. Blakeslee v. Clausen*, 85 Wash. 260, 148 P. 28 (1915); *State ex rel. Case v. Howell*, 85 Wash. 281, 147 P. 1162 (1915); and recently in *Fritz v. Gorton*, 83 Wn.2d 275, 517 P.2d 911 (1974). *See* Trautman, *Initiative and Referendum in Washington, A Survey*, 49 Wash. L. Rev. 55. Nothing in the instant case requires that we add further to the reason for and philosophy of amendment 7.

## Decision

A majority of this court concludes that initiative measure 282 was properly filed, supported by sufficient voter signatures, presented to the voters, adopted, and enrolled into law December 6, 1973, by proclamation of the Governor. It is constitutional; it is, therefore, an effective amendment to Laws of 1973, 1st Ex. Sess., ch. 137, § 110. The order restraining the State Treasurer from paying salaries pursuant to Laws of 1973, 1st Ex. Sess., ch. 137, § 110 is made permanent. The petition for writ of prohibition is dismissed with prejudice.

We have considered the arguments advanced by those who contend otherwise. We discuss the issues we deem controlling.

## Title Of Initiative

January 4, 1974, six days before oral argument in the instant case, the Supreme Court filed its opinion in *Fritz v. Gorton*, 83 Wn.2d 275, 517 P.2d 911 (1974), an action challenging the constitutionality of initiative measure 276, the public disclosure act. The *Fritz* decision was called to our attention by additional authorities filed the day of argument.

Nowise does the *Fritz* decision affect our consideration. We did notice in our conference and consideration, however, one facet of the *Fritz* opinion—the discussion of whether our constitution, article 2, section 19, providing:

No bill shall embrace more than one subject, and that shall be expressed in the title.

applied to initiative measures.

In *Gilman v. State Tax Comm'n,* 32 Wn.2d 480, 489, 202 P.2d 443 (1949) (the veterans bond issue initiative measure 169), the court remarked:

a majority of the court is also of the opinion *that the ballot title was not sufficiently broad* to make the bonds, if they had been constitutional, a general obligation of the state of Washington.

(Italics ours.)

Two years later, without mentioning *Gilman,* in *Senior Citizens League, Inc. v. Department of Social Security,* 38 Wn. 142, 173, 228 P.2d 478 (1951), the court held that this constitutional provision does not apply to initiative measures.

Now, the *Fritz* opinion throws some doubt upon the efficacy of *Senior Citizens.*

■ With this we have no concern. Under any criteria, we are of the opinion that the title of initiative measure 282, quoted *supra,* meets this constitutional provision. It gives a true and impartial statement of the purpose of the measure; it does not present an argument; nor is it likely to create prejudice either for or against the measure. It is sufficient.

CONTENTION: CONSTITUTIONAL RESTRAINTS DO
NOT APPLY TO INITIATIVES

The original sponsor of the initiative, who was petitioner in *State ex rel. Helm v. Kramer, supra,* was granted permission to file a brief and present oral argument as amicus curiae supporting the position espoused by respondents.

Counsel for petitioners point out that the brief of amicus curiae presents an issue not advanced by either petitioners

or respondents. We are aware that the Supreme Court of this state in *Long v. Odell,* 60 Wn.2d 151, 372 P.2d 548 (1962), declined to discuss issues presented for the first time by amicus; but we fear, should we fail to answer the issue raised, it would be interpreted as silent approval of the bizarre theory advanced by amicus.

Stated simply, amicus' argument is that the people, by initiative, can either *increase* or *decrease* compensation of state elective officials during their term of office. Stated more formally in his brief, the proposition is set forth as follows:

Assuming for purposes of argument that the effective date of § 110 was prior to the passage of initiative measure 282 and that state elected officials had a vested right to a salary increase, initiative 282 did not violate the state constitution.

Amicus' brief ends with the statement:

The amendments [constitutional] . . . do *not* apply to the people who reserve all power they do not specifically delegate.

(Italics ours.)

In oral argument, amicus counsel was more explicit. He stated:[5]

. . . assuming that the earlier effective date . . . [of Laws of 1973, 1st ex. sess., ch. 137, § 110] . . . is accepted, and assuming that this court considers that their salaries would be diminished by an initiative, it is the position of the amicus that the people of the State of Washington are not prevented from diminishing the salaries of state elected officials through the initiative process. . . . Although the legislature is prevented from diminishing or increasing salaries of elected officials, the people are not so prevented.

. . . the final argument I have raised regarding the ability of the people, by initiative, to change salaries—to diminish salaries—I think that this court should hold that they can and that the writ should be denied.

He and his principal would have us burke the constitu-

---

[5]Since 1958 all proceedings in open court of the Supreme Court of Washington have been electronically recorded. They are public records.

tion and its heretofore judicial interpretation applying to initiatives.

■ It is a rule, become axiomatic by long continued reiteration, that no court will hold a law to be unconstitutional unless such holding is compelled; that a law will not be held unconstitutional by construction.

On at least two occasions, however, the Supreme Court of this state has not hesitated to declare initiatives passed by the people unconstitutional if the initiative did not meet constitutional requirements.

In 1932, the electorate passed initiative measure 69, a state income tax. Laws of 1933, ch. 5, p. 49. In *Culliton v. Chase*, 174 Wash. 363, 373-74, 25 P.2d 81 (1933), the initiative was held unconstitutional, the court saying:

> The fact that the income tax law was passed as an initiative measure is of no controlling importance, . . .
>
> . . . All laws on any subject whatever, *enacted by either the people or the legislature*, must be governed by the provisions of the constitution in force at that time. "The people in their legislative capacity are not, however, superior to the written and fixed constitution." *State ex rel. Berry v. Superior Court*, 92 Wash. 16, 159 Pac. 92.

(Italics ours.)

In 1948, the electorate passed initiative measure 169 that provided for the payment of a veterans' bonus and authorized the sale of bonds of the state in the sum of one hundred million dollars. In *Gilman v. State Tax Comm'n*, 32 Wn.2d 480, 202 P.2d 443 (1949), the initiative was held unconstitutional.

We reject the contention of amicus that appropriate constitutional provisions do not apply to initiatives. To do otherwise would be a recognition that we have an initiative process "governed by men and not by law." Nothing in this opinion is to be interpreted as opening a Pandora's box, releasing a runaway, uncontrolled initiative process.

CONTENTION: THE LEGISLATURE HAS
THE SOLE RIGHT TO DETERMINE
COMPENSATION OF STATE OFFICIALS

[4] In 1948, the electorate adopted amendment 20 to the state constitution. The first sentence of the amendment provides:

All elected state officials shall each severally receive such compensation as the *legislature may* direct.

(Italics ours.)

From this, petitioners argue that the legislature has the *sole* right to determine compensation, and that the initiative process established in 1912 by amendment 7 to the constitution is not available for this purpose. In order to support this thesis we would have to conclude that the word "legislature" embodies only the house and senate, and excludes that portion of the legislative power defined in amendment 7 as "[t]he first power reserved by the people" —the initiative.

Subsequent to the adoption of amendment 7 in 1912, but *prior* to the adoption of amendment 20 in 1948, the Supreme Court held that the word "legislature," as used in the constitution must be deemed to include all branches or component parts of legislative power, which includes qualified voters if they so desire. *State ex rel. Mullen v. Howell*, 107 Wash. 167, 181 P. 920 (1919).

Of course, if there is express constitutional limitation upon the right of the electorate to participate in the legislative process, the limitation must be enforced. For example, the second power reserved by the people—the *referendum* —does not apply to ·

such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions · · ·

Const. art. 2, § 1(b) (amendment 7).

This limitation has recently been reaffirmed in *State ex rel. Helm v. Kramer*, 82 Wn.2d 307, 510 P.2d 1110 (1973) (discussed *infra*).

Our court, in *State ex rel. Mullen v. Howell, supra* at 182-83, quoted at some length from *State ex rel. Schrader v. Polley,* 26 S.D. 5, 127 N.W. 848 (1910), as follows:

"We are also of the opinion that the word 'Legislature,' as used in section 4, art. 1, of the federal Constitution, does not mean simply the members who compose the Legislature, acting in some ministerial capacity, but refers to and means the lawmaking body or power of the state, as established by the state Constitution, and which includes the whole constitutional lawmaking machinery of the state. . . . Under the Constitution of this state, *the people, by means of the initiative and referendum, are a part and parcel of the lawmaking power of this state, and the Legislature is only empowered to act, in accordance with the will of the people as expressed by the vote, when the referendum is properly put in operation. The term 'Legislature' has a restricted meaning which only applies to the membership thereof, and it also has a general meaning which applies to that body of persons within a state clothed with authority to make the laws (Bouvier's Law Dic.; Webster's Dic.; 18 Am. & Eng. Ency. 822; 25 Cyc. 182), and which, in this state, under section 1, art. 3, Const. S. D., includes the people. . . .*
". . . The "Legislature" of the state, in its fullest and broadest sense, signifies that body in which all the legislative power of a state reside [*sic*], and that body is the people themselves, who exercise the elective franchise, and upon their power of legislation there is no limitation or restriction, except such as may be found in the federal Constitution, or such as they themselves may provide by the organic law of the state.' "

(Italics ours.)

Our own curiosity prompted the query: Just what were the issues before the electorate in 1948 when amendment 20 was adopted? Our limited research, although it may bulge the boundaries of the doctrine of judicial notice, as defined in *State ex rel. Humiston v. Meyers,* 61 Wn.2d 772, 380 P.2d 735 (1963), proved informative and interesting.

The second sentence of amendment 20 provides:

The compensation of any state officer shall not be increased or diminished during his term of office, except that the legislature, at its thirty-first regular session, may

increase or diminish the compensation of all state officers whose terms exist on the Thursday after the second Monday in January, 1949.

The 1948 statutory voters' informational pamphlet, mailed to each voter, which is on file in the office of the Secretary of State, has neither arguments for nor against the amendment.

Reference, however, to contemporary news and editorial comment[6] discloses no reference to the first sentence of the amendment, but establishes conclusively that the purpose of the amendment was to give the legislature a one-chance opportunity to correct the grossly inadequate salaries of certain state elected officials. For example, article 3, sections 14, 17, 19 and 21, fixed the salaries of the following officials at the first figure, but stated those salaries "shall never exceed" the second: Governor, $4,000-$6,000; Secretary of State, $2,500-$3,000; State Treasurer, $2,000-$4,000; Attorney General, $2,000-$3,500. Article 2, section 23 fixed compensation for legislators at $5.00 for each day's attendance during the session. Those salaries had been frozen by our 1889 constitution adopted 59 years before the proposed constitutional amendment was submitted to the people.

There is nothing to indicate that the voters contemplated limiting their rights under amendment 7 by the adoption of the first sentence of amendment 20.

We conclude, therefore, that amendment 20 did not give the legislature the *sole* right to determine compensation of state officials.

CONTENTION: INITIATIVE MEASURE 282 IS
IN FACT AN UNCONSTITUTIONAL REFERENDUM
OF A MEASURE IN SUPPORT OF STATE
GOVERNMENT.

The initiative and referendum are constitutional means by which the electorate may express legislative intent.

[6]Seattle P.-I., September 7, October 28, 1948; Spokesman-Review, October 21, October 28, 1948; Bellevue American, October 28, 1948; Walla Walla Union Bulletin, October 19, 1948; Daily Olympian, November 1, 1948; Vancouver Columbian, October 19, 1948.

They are completely separate powers and may be separately exercised. Each is a distinct process having its own constitutional and statutory "rules of the road."

By the referendum initiated either by a petition signed by the required number of registered voters or by direction of the legislature itself, the electorate either approves or rejects an act of the legislature. By the initiative the electorate may propose and enact legislation whether it amends existing law or enters an entirely new field. Although both processes furnish a broad base for the exercise of power by the people, there are constitutional and statutory differences between the two processes. Except for one, we deem it beyond our function as a pro tempore Supreme Court to elaborate upon these differences when it is not necessary for a decision in the instant case.

As we have heretofore pointed out, when the legislature enacted Laws of 1973, 1st Ex. Sess., ch. 137, § 110, granting state elected officials and the judiciary substantial salary increases, the Secretary of State refused to file documents providing for a referendum of section 110.

In *State ex rel. Helm v. Kramer,* 82 Wn.2d 307, 510 P.2d 1110 (1973), the Supreme Court denied a petition for writ of mandamus directed to the Secretary of State upon the ground that Laws of 1973, 1st Ex. Sess., ch. 137, § 110, was not subject to referendum because under the constitution the right of referendum does not apply to ". . . such laws as may be necessary for the . . . support of the state government and its existing public institutions . . ." Const. art. 2, § 1(b) (amendment 7).

With this decision, we have no quarrel; but we do not agree with petitioners' conclusion that the decision makes initiative measure 282 a "functional referendum" and hence constitutionally invalid.

Petitioners' conclusion is akin to the early common-law theory of pleading that if a litigant asked for a writ of replevin when his action should have sounded in detinue, or vice versa, he lost his remedy. This has never been a theory under our code procedure.

Initiative measure 282 *amends* Laws of 1973, 1st Ex. Sess., ch. 137, § 110. It, too, grants increased compensation to those involved, commencing January 1, 1974, but on a more modest scale.

A statute passed by the initiative process must be in clear conflict with a specific provision of the constitution before it can be declared unconstitutional. We find nothing in the constitution, statutes, or the prior opinions of the Supreme Court to throw doubt upon our conclusion that initiative measure 282 is *not* an unconstitutional referendum in disguise. It is a valid amendment of a statute that had not yet become effective.

CONTENTION: INITIATIVE MEASURE 282 IS UNCONSTITUTIONAL BECAUSE IT PURPORTS TO DIMINISH THE SALARIES OF STATE ELECTED OFFICIALS AND OF THE JUDICIARY DURING THE TERM FOR WHICH THEY WERE ELECTED

To reach this conclusion, petitioners must start with the major premise that they first received an *increase* of compensation during their term of office by reason of Laws of 1973, 1st Ex. Sess., ch. 137, § 110, which compensation was subsequently reduced by initiative measure 282.

The major premise is faulty; the conclusion is fallacious.

In 1968, article 30, section 1, of the state constitution was adopted. It provides:

> The compensation of all elective . . . state . . . officers who do not fix their own compensation, including judges of courts of record . . . may be increased during their terms of office to the end that such officers and judges shall each severally receive compensation for their services *in accordance with the law in effect at the time the services are being rendered.*

(Italics ours.)

What was the law in effect January 1, 1974?

■ Prior to Laws of 1973, 1st Ex. Sess., ch. 137, § 110, the officials and judges were receiving salaries prescribed by prior legislation that had been in effect for several years. The increase provided by section 110 did not become effective until January 1, 1974. This is not unique. Some

other sections of Laws of 1973, 1st Ex. Sess., ch. 137—an appropriation bill—do not apply immediately or become effective until future dates. For us to determine now that they become effective *immediately might produce some* fantastic results. The legislature, in the absence of constitutional restraint, may fix any time in the future as the time when a statute shall become effective. *State ex rel. Blakeslee v. Clausen,* 85 Wash. 260, 148 P. 28 (1915). It is a cardinal rule that a statute passed to take effect at a later date speaks from the time it becomes operative and not from the time of its passage.

In *Walker v. Lanning,* 74 Wash. 253, 256, 133 P. 462 (1913), the court quoted with approval as follows:

"Until the time arrives when it is to take effect and be in force, a statute which has been passed by both houses of the legislature and approved by the executive *has no force whatever for any purpose,* and all acts purporting to have been done under it prior to that time are void." 36 Cyc. 1192.

(Italics ours.)

Without more, the increased salaries would have become effective January 1, 1974.

Meanwhile, however, the voters *amended* section 110 by initiative measure 282. Its adoption was certified by the Governor December 6, 1973. It became effective January 1, 1974, as the only valid salary-increase legislation for state elected officials and the judiciary which is now in effect. Both being validly enacted statutes, the one last in time— the initiative—controls. No state official or judge had acquired a vested interest in a salary increase until January 1, 1974.

Accordingly, there was no reduction of salary of any state official or judge. On the contrary, there was a salary increase.

Other subsidiary contentions have been made, but we do not consider them of moment, controlling, or necessary to our decision. To discuss them would unduly extend the length of this opinion.

In summary, initiative measure 282 is an effective amendment of Laws of 1973, 1st Ex. Sess., ch. 137, § 110, and the order restraining the State Treasurer from paying salaries pursuant to said section 110 is made permanent. The petition for a writ of prohibition against the Secretary of State is dismissed with prejudice.

It is so ordered.

DONWORTH, RYAN, STIGER, KALE, CRAMER, and STUNTZ, JJ. Pro Tem., concur.

WICKS, J.* (dissenting)—In my opinion the issues in this case are res judicata. They have all been fully and completely settled, determined and disposed of in *State ex rel. Helm v. Kramer,* 82 Wn.2d 307, 510 P.2d 1110.

The purpose and intent of petitioner in the *Helm* case was exactly the same as that of the proponents of initiative measure 282, to have the people "approve or reject" at the polls "an item, section or part" of a law passed by the legislature, section 110, chapter 137, Laws of 1973, first extraordinary session.

In that case the petitioner sought a writ of mandamus to compel the Secretary of State to accept for filing documents tendered to him for referendum so the people might "approve or reject" at the polls section 110 which provided a substantial increase in the annual compensation to be paid the elected state officials therein mentioned. The action was founded on the "referendum" portion, article 2, section 1, amendment 7, of the state constitution, which provides:

(b) Referendum. The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, *except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions,* . . .

(Italics mine.)

---

*Justice Wicks is serving as a justice pro tempore of the Supreme Court pursuant to Const. art 4, § 2(a) (amendment 38).

The exceptions mentioned in this paragraph of the constitution are frequently referred to as "emergency provisions." This has doubtless come about by reason of the word "immediate." But the word "immediate" is not controlling. These are provisions that limit the use of the referendum. They restrict its use and were included for a very definite and specific reason. They must be read and given the same solemnity as the other provisions of the article.

Chapter 137 contained these restrictive clauses and the court in the *Helm* case, by reason thereof, correctly held section 110 was not subject to referendum.

The petitioner in the *Helm* case being thus prevented from presenting to the people the issue of the increase in compensation as provided in section 110, sought some other avenue to present the issue to the people, the use of the "initiative."

The first paragraph of article 2, section 1, amendment 7, provides:

> the people reserve to themselves the power to *propose bills, laws, and to enact or reject the same* at the polls,
> . . .

(Italics mine.)

Paragraph (a) that immediately follows reaffirms the initiative provision in the first paragraph and provides the mechanics for its use.

The powers of initiative and referendum are separate and distinct. By the "initiative" the people "propose bills, laws, and . . . enact or reject the same at the polls." By the "referendum" the people may order it on "any act, bill, law, or any part thereof passed by the legislature" with certain enumerated exceptions. The purpose of the referendum is for the people to determine at the polls whether they approve or reject an "act, bill, law, or any part thereof passed by the legislature."

To determine the issue of whether initiative 282 is an unconstitutional use of the initiative process and is in fact, a referendum we must look to the substance, purpose and intent of the proponents.

In *State ex rel. Mullen v. Howell,* 107 Wash. 167, 181 P. 920, the court, in examining the provisions of article 2, section 1, having specific reference to the referendum provision, said:

> *"The courts are not bound by mere forms, nor are they to be misled by mere pretences. They are at liberty—indeed, are under a solemn duty to look to the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority." Mugler v. Kansas,* 123 U.S. 623, 661.

(Italics mine.)

Looking then at the substance of initiative 282 we find it nothing more than a pretense in an attempt to use the initiative as a referendum to avoid the emergency or rather restrictive provision of the referendum provisions of the constitution.

It is argued that initiative 282 is a "bill or law" as those terms are used in the initiative provisions of the constitution; that it is something new or different from section 110. I don't find it so. The provisions for increases in initiative 282 are the same as in section 110 but in a lesser amount. Initiative 282 is a reenactment of section 110 but "rejecting" any increase over and above 5.5 percent. That this was the purpose and intent of the proponents of initiative 282 is demonstrated in section 1, wherein the proposed respective salaries are set forth:

## Schedule of Annual Salaries

### Executive Officials

| | | |
|---|---|---|
| Governor | $((~~47,300~~)) | 34,300 |
| Lieutenant Governor | $((~~22,000~~)) | 10,600 |
| Attorney General | $((~~37,950~~)) | 24,300 |
| Superintendent of Public Instruction | $((~~37,950~~)) | 23,750 |
| Commissioner of Public Lands | $((~~33,000~~)) | 21,100 |
| Auditor | $((~~29,700~~)) | 17,400 |
| Insurance Commissioner | $((~~29,700~~)) | 17,400 |
| Secretary of State | $((~~26,400~~)) | 15,800 |
| Treasurer | $((~~26,400~~)) | 15,800 |

### Judicial Officials

Supreme Court ....:.............. $((~~38,000~~)) 34,825
Court of Appeals ................. $((~~35,000~~)) 31,650
Superior Court ................... $((~~32,000~~)) 28,500
Full Time District Court Judges: PROVIDED,
That no funds shall be allocated from this
appropriation to implement these salary
increases ....................... $((26,000)) 23,250

### Legislative Officials

Legislators ....:................ $((10,560)) 3,800

It will be noted the increases provided in section 110 are set forth and stricken and a lesser amount set opposite the name of each officer. Presumably, the lesser amount is 5.5 percent above the old schedule. This is clearly a proposal to present to the people an opportunity to determine at the polls a rejection or approval of a section of a law passed by the legislature; clearly a referendum function. Initiative 282 added nothing, it gave nothing that was not provided in section 110.

To carry this thought a step further, suppose initiative 282 had provided section 110 be amended by striking the increases therein provided. It is obvious such a proposal would be a referendum and subject to the restrictive clauses of the referendum provision. Suppose it had provided section 110 be amended by providing the annual compensation of these officials should be increased by 1 cent. It would seem clear such a proposal would be an attempt by the proponents to use the initiative process as a means of evading the restrictive provisions of the referendum. An attempt by the initiative process to approve or reject a part of an act passed by the legislature. It still would have all the ear marks of a referendum. There is no magic in the 5.5 percent increase provided in initiative 282. It is still a proposal to present to the people for their determination at the polls the question of whether they approve or reject a section of an act passed by the legislature—an attempt by the initiative process to circumvent the restrictive clause of the referendum. To hold otherwise is to open an avenue

whereby "any act, bill [or] law" passed by the legislature may be presented to the people as an initiative by adding the simplest phrase or clause calling it an amendment. This would make the restrictive clauses of the referendum meaningless. Such was not the intent and purpose of the people in the adoption of amendment 7 and subsequent amendments thereto.

The order restraining the State Treasurer from paying salaries pursuant to section 110 should be vacated. The writ of prohibition against the Secretary of State should have been granted.

KELLY, J.* (dissenting)—I concur generally in Judge Wicks' dissent, and would add the following:

The primary question in this case is a constitutional one. Initiatives, including initiative 282, are subject to the same scrutiny and limitations as any other enactment, and have at times been declared unconstitutional. *See State ex rel. Berry v. Superior Court,* 92 Wash. 16, 159 P. 92 (1916); *Culliton v. Chase,* 174 Wash. 363, 25 P.2d 81 (1933); *Gilman v. State Tax Comm'n,* 32 Wn.2d 480, 202 P.2d 443 (1949); *Ford v. Logan,* 79 Wn.2d 147, 483 P.2d 1247 (1971).

The appropriation bill, chapter 137, first extraordinary session, passed by the state Senate and House of Representatives, and signed by the Governor April 24, 1973, substantially embodied the recommendations of the duly and legally appointed state committee on salaries created by statute. RCW 43.03.027-.047. *See State ex rel. Helm v. Kramer,* 82 Wn.2d 307, 510 P.2d 1110 (1973), for personnel of the committee. This committee was created and acted before the convening of the legislature that passed chapter 137, including section 110, against which initiative 282 was directed. The measure contained the usual emergency clause found in budget bills, providing for the support and orderly functioning of state government.

If there is a conflict between the constitutional power

*Justice Kelly is serving as a justice pro tempore of the Supreme Court pursuant to Const. art 4, § 2(a) (amendment 38).

*specifically* vested in the duly elected state legislature, pursuant to amendment 20 of the state constitution, and the nebulous reservation of power claimed by the proponents of initiative 282, within the framework, background and history of this case (and there is: amendment 7, article 2, section 1(a) and (b) state constitution), the latter must give way to the former; the latter being an unconstitutional attempt, under the guise of an initiative, to deprive the constitutional legislature of its specific constitutional power, by a tortuous interpretation and application of parts of amendment 7. *Kramer* has held this cannot be done by referendum. Does greater constitutional power repose in the approach by initiative?

My answer is no. It is an attempt to do the same thing. Where will it end? It should end here. We should hold that the specificity of the constitutional power vested in the duly elected legislature clearly outweighs, and is paramount, in this case, under any interpretation of the law, to the power claimed reserved under the initiative provisions of the state constitution.

To vacillate and procrastinate at this stage is to invite chaos and confusion. The majority seems willing to take that chance. I do not think we should.

That uncertainty exists in the minds of the court majority is reflected in a quotation from their opinion:

> We reject the contention . . . that appropriate constitutional provisions do not apply to initiatives. To do otherwise would be a recognition that we have an initiative process "governed by men and not by law." Nothing in this opinion is to be interpreted as opening a Pandora's box, releasing a runaway, uncontrolled initiative process.

In my opinion that is just what the majority is doing, notwithstanding the disclaimer. The latent fear or possibility implied in the foregoing quotation has become a reality, and an invitation to do likewise in reference to any act of the legislature pertaining to the budget, even though the latter in many instances is predicated upon the recommendation, through the Governor, of a statutorily appointed

state committee on salaries. It means that through an initiative, the whole or any part of a given budget dealing with salaries can be amended or *nullified*. This will result in the breakdown of the entire legislative system, an end surely not contemplated or intended by those who desire to maintain the orderly, albeit, sometimes slow, processes of the law.

To use the power of the initiative process in that way, in my opinion, is unconstitutional, and should not be sanctioned by this court in this case.

I dissent.